UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-20323-CR-ALTONAGA

**UNITED STATES OF AMERICA**,

    Plaintiff,
v.

**TIFFANY FOSTER**,

    Defendant.
_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendant, Tiffany Foster's ("Foster['s]") Motion for Judgment of Acquittal ("Motion") [ECF No. 420], filed March 13, 2015.[1] The United States of America (the "Government") filed a Response . . . ("Response") [ECF No. 430] on March 27, 2015. Foster filed a Reply . . . ("Reply") [ECF No. 432] on April 6, 2015. The Court has carefully considered the parties' written submissions, the record, and applicable law. For the reasons explained below, the Court grants the Motion.

    Following a trial, the jury returned verdicts of guilty on the crimes with which Foster was charged in the Superseding Indictment [ECF No. 142]: Count 1, conspiracy to commit health care fraud and conspiracy to commit wire fraud; and Count 9, conspiracy to defraud the United States and pay and receive kickbacks. (*See* Verdict [ECF No. 378]). Foster requests a judgment of acquittal on the basis the evidence at trial established she withdrew from the conspiracies more than five years before the date of the original Indictment [ECF No. 4] in May 2014, thus triggering the statute of limitations. (*See* Mot. 4; Indictment); *see also* 18 U.S.C. § 3282(a) (establishing five-year statute of limitations for noncapital offenses). In particular,

---

[1] On the same day Foster also filed a Motion for New Trial ("Motion for New Trial") [ECF No. 421].

Foster asserts her statements to the Federal Bureau of Investigation ("FBI") "constituted a completed withdrawal" (Mot. 4), as did a letter to her supervisor, Karen Kallen-Zury ("Kallen-Zury"), and statements to the attorney for her former employer, Hollywood Pavilion ("HP") (*see id.* 9–11).

## I. LEGAL STANDARD

On a request for judgment of acquittal under Federal Rule of Criminal Procedure 29(c), "a district court should apply the same standard used in reviewing the sufficiency of the evidence to sustain a conviction." *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999) (citation omitted) (hereinafter, "*Ward I*"). This means a "verdict of guilty must stand if there is *substantial evidence* to support it . . . ." *United States v. Toler*, 144 F.3d 1423, 1428 (11th Cir. 1998) (clarifying the meaning of "slight evidence" needed to support a conspiracy conviction) (emphasis added). Any conflicts in the evidence are resolved in favor of the Government, and all inferences that tend to support the Government's case must be accepted. *See Ward I*, 197 F.3d at 1079. The Court is to determine "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (citations omitted); *see also United States v. Medina*, 485 F.3d 1291, 1296–97 (11th Cir. 2007).

## II. ANALYSIS

Foster[2] seeks acquittal on the ground she withdrew from the conspiracies more than five years before she was indicted, in one of (or in various combinations of) three ways: (1) her September 13, 2005 letter fax to Kallen-Zury (*see* Mot. 1, 9); (2) her November 2008 statements to Aaron Danzig ("Danzig"), an attorney for HP and Kallen-Zury, that she was no longer

---

[2] Foster was previously known by various other last names, including Lee and Coleman; this Order uniformly refers to her as Foster.

participating in HP's activities (*see id.* 2, 9); and (3) her March 23, 2009[3] interview with an FBI agent in which she "informed the FBI of numerous forms of Medicare fraud that were being committed by HP" (*id.* 3). She asserts the Government "failed to overcome" her withdrawal defense. (*Id.* 11).

The Government responds the "purported" 2005 fax "is at best opaque" and the mere cessation of activity it evinces is insufficient to prove withdrawal (Resp. 6); the "purported" 2008 conversation with Danzig "is irrelevant for purposes of withdrawal, since only months later [Foster] elected to lie to law enforcement" and the jury could reasonably discount Danzig's testimony (*id.* 8 (alteration added)); and Foster lied during her 2009 FBI interview, thus perpetuating the fraud "as a means of deceiving law enforcement" (*id.* 3–4).

### A. The Law of Withdrawal

To establish the affirmative defense of withdrawal,

> the defendant has the substantial burden of proving: (1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities. . . . A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal.

*United States v. Acuna*, 313 F. App'x 283, 292 (11th Cir. 2009) (alteration added; internal citations and quotation marks omitted). While a "defendant's burden in this regard is substantial," *United States v. Finestone*, 816 F.2d 583, 589 (11th Cir. 1987), courts confronting a statute of limitations defense must be mindful of "the principle that criminal limitations statutes are to be liberally interpreted in favor of repose . . . ." *Toussie v. United States*, 397 U.S. 112, 115 (1970) (citations and internal quotation marks omitted).

---

[3] Foster incorrectly notes the date of the interview as March 23, 2008. (*See* Mot. 2; *see also* Jury Trial Excerpt — Day 11, 87 ("1/28 Trial Transcript") [ECF No. 351]).

3

As for the second prong of the test articulated in *Acuna*, the parties dispute the showing a defendant must make. (*See generally* Mot., Resp.). With regard to disclosure of the scheme to law enforcement, the Government contends "courts, including the Eleventh Circuit, require 'a full confession of guilt.'" (Resp. 4 (quoting *McCray v. United States*, 276 F.2d 705, 707 (5th Cir. 1960)); footnote call number and other citations omitted)). Foster, meanwhile, argues "far less is required, and . . . the real test is whether the agency relationship between Ms. Foster and the conspiracy has been terminated." (Mot. 5 (alteration added)).

While authorities on this point are not well developed, the Court rejects the Government's reading of *McCray*. The court in *McCray* disagreed with two defendants' arguments they had proven withdrawal from a conspiracy by testifying they had "decided that [they] did not want to participate any further in the illegal transaction" and "sat on the ground waiting" while others completed the criminal scheme. *McCray*, 276 F.2d at 706 (alteration added). The Fifth Circuit held the defendants' claim of renunciation or abandonment was an "issue of fact" for the jury, and no instruction on withdrawal was needed for the charged substantive crimes because they were "consummated before the claimed abandonment or renunciation . . . ." *Id.* at 707 (footnote call number omitted). The court concluded:

> When, as here, the offenses charged are substantive offenses and the defendants admit that they committed them, there is no room or place for purging guilt by abandonment of the criminal act and renunciation of the criminal intent. There is only place and time for a full confession of guilt and a plea for mitigation and mercy, based upon a sincere repentance and the promise of fruits worthy of such repentance.

*Id.*

Reading the phrase "full confession of guilt" in context, it is obvious the Government severely distorts the holding of *McCray*. Nothing in the decision lays down a requirement of "full confession of guilt" to prove withdrawal from a conspiracy; instead, the Fifth Circuit was

4

merely referring to the course the defendants should have taken to mitigate their sentences — an issue distinct from the requirement for withdrawal. *See id*. The Court thus declines to give effect to the Government's interpretation of *McCray*.

Many of the Government's additional authorities also fail to persuade because their statements on this point are dicta. *United States v. Vallone*, for example, notes one way of proving withdrawal is making a "full confession to the authorities," but the case concerns the proper application of sentencing guidelines, and does not analyze a defendant's confession or lack thereof. 752 F.3d 690, 695 (7th Cir. 2014) (citations and internal quotation marks omitted). The same problems exist in *United States v. Kushner*, 305 F.3d 194 (3d Cir. 2002), and in *United States v. Nakauchi*, which rejected the defendant's withdrawal argument concerning the length of his sentence because he "provided only limited information, not a full confession." 86 F. App'x 708, 709 (5th Cir. 2004) (citing *United States v. Jimenez*, 622 F.2d 753, 757–58 (5th Cir. 1980)).[4] *United States v. Piper* echoes the "full confession" language, but the case did not involve a defendant's confession to a law enforcement officer; instead the defendant argued withdrawal from the conspiracy based on having ceased his activities with co-conspirators. 298 F.3d 47, 53 (1st Cir. 2002) (citation and internal quotation marks omitted).

---

[4] Further, the only support for *Nakauchi*'s holding on this point, *Jimenez*, concerned a defendant who "argued that his statement . . . that 'he wanted out of the deal, and that (Agent Henderson) would deal with [co-conspirator] Silva further,' was an affirmative act which demonstrated his intent to extricate himself from the conspiracy." *Jimenez*, 622 F.2d at 756 (alterations added). The defendant, however, made these statements to the agent while he was *undercover* and attempting to effectuate a sale of narcotics. *See id.* at 754. Further, "the only act inconsistent with the conspiracy's purposes claimed by [defendant] was his disavowal of it," a far cry from Foster's actions, described below. *Id.* at 758 (alteration added). *Jimenez* is thus irrelevant concerning the standard required for disclosure of a criminal scheme to law enforcement, the question this Opinion addresses. As the unpublished case of *Nakauchi* relies on this decision as the sole support for its conclusion, the Court does not find it persuasive. *See Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007) ("Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." (citation omitted)).

CASE NO. 14-20323-CR-ALTONAGA

The Government's final authority, *Brown v. United States*, involved a habeas petitioner's argument his attorney was ineffective for failing to pursue a withdrawal defense to conspiracy charges. 261 F. App'x 865, 866 (6th Cir. 2008) (per curiam). The court noted the defendant "failed to make a full confession to the FBI" by "omitting relationships that he had previously established with co-conspirators in this case." *Id.* at 867 (citation omitted). However, because it was a habeas case, the court's analysis was limited to whether the defendant's trial attorney was deficient for having failed to pursue this defense; the court found it was a "strategic decision" and "precisely the kind of sound trial strategy that . . . constitutes acceptable representation." *Id.* at 868 (alteration added).[5] The unique procedural posture of *Brown* prevents it from establishing the Government's desired rule.

Instead, the Supreme Court has indicated proving withdrawal is more flexible than requiring a defendant's "full" confession. In *United States v. United States Gypsum Company*, the Supreme Court disapproved of a jury instruction on withdrawal that required proof "a defendant either must have affirmatively notified each other member of the conspiracy he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence, or he must make disclosures of the illegal scheme to law enforcement officials." 438 U.S. 422, 463–64 (1978) (emphasis and internal quotation marks omitted). The opinion concluded such an instruction "limited the jury's consideration to only two circumscribed and arguably impractical methods of demonstrating withdrawal from the

---

[5] In addition, the authority cited by the *Brown* court for requiring a "full confession" — *United States v. Chambers*, 944 F.2d 1253 (6th Cir. 1991) — does not persuade the undersigned of the Government's proffered rule. The defendant in *Chambers* was arrested and later "made a statement to the police in which she admitted selling $100 worth of cocaine, but otherwise provided little information." *Id.* at 1265. Unlike Foster's statements, *see infra*, there is no indication the defendant in *Chambers* revealed the extent of the conspiracy or even named any other members of the conspiracy who were committing or had committed crimes. *Brown* therefore does not weigh in favor of the Government's contention on this point. *See Bonilla*, 487 F.3d at 1345 n.7.

conspiracy." *Id.* at 464 (footnote call number omitted). The Supreme Court held, "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *Id.* at 464–65 (citations omitted).

Nothing in the Supreme Court's generally recognized test requires full disclosure of an individual's *own* actions in a conspiracy; an effective withdrawal is, after all, meant to "defeat the objectives of the conspiracy . . . ." *United States v. LeQuire*, 943 F.2d 1554, 1564 (11th Cir. 1991). Further, the *Acuna* test only requires the defendant to have "disclosed the *scheme* to law enforcement authorities," and says nothing of disclosing all of one's own *actions* within the scheme. *Acuna*, 313 F. App'x at 292 (emphasis added; citations omitted). If a conspirator can defeat the objectives of the conspiracy without implicating himself or herself in all aspects of the conspiracy, the underlying purpose of the withdrawal doctrine is served no differently than when a conspirator defeats a conspiracy by detailing all of his or her activities. *See Hyde v. United States*, 225 U.S. 347, 369 (1912) ("Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until [the defendant] does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law." (alteration added)). The proper inquiry is whether Foster's disclosures to law enforcement were themselves "some act to disavow or defeat the purpose" of the conspiracies. *Id.*[6]

---

[6] While at first glance this test would seem to subsume the second prong of the *Acuna* test into the first, in fact it would be possible for a defendant to make a disclosure to law enforcement that did not serve to disavow or defeat the purpose of the conspiracy — for instance, by failing to disclose the essential nature of the conspiracy, or by making a disclosure that failed to indicate others were involved in criminal activities.

**B. Application**

In deciding the Motion, the Court focuses on Foster's last act presented as evidence of withdrawal: whether the March 2009 interview with Special Agent Andres Durango ("Durango") of the FBI constituted a withdrawal from the charged conspiracies.[7] (*See* Reply 2). Durango "received a lead from the Miami FBI office" before interviewing Foster. (1/28 Trial Tr. 88). The lead asked his field office to "locate Ms. [Foster] and interview her on her knowledge of Hollywood Pavilion." (*Id.* 89 (alteration added)). During the interview, Foster said her business, Angels Outreach, was a drug and alcohol outreach program, but she did not say it was "in the business of patient brokering" or was a "front." (*Id.* 94).

Foster said HP was a detox facility, and she knew it had "no waiting list for patients . . . ." (*Id.* 95). Foster did not give Durango any indication she had been paid to be a patient broker for HP. (*See id.*). Foster said she had been paid to do marketing for HP and did assessments of patients at an hourly rate. (*See id.*). She gave Durango a copy of a contract she said had been reviewed by an attorney. (*See id.* 96). She did not reveal (as the Government contends) the contract was meant to cover up the fact she had been a patient broker for HP. (*See id.*). She did not tell Durango about HP's submission of false or fraudulent claims to Medicare based on bribes or kickbacks. (*See id.* 137).

Foster recounted certain problems with HP: she mentioned some at HP acted improperly by sending patients to recovery homes when it was unnecessary. (*See id.* 97–98). She said an individual, Gloria Himmons ("Himmons"), worked as a "patient broker" and might have sent patients to HP, although Foster did not say she had introduced Himmons to HP. (*Id.* 100; *see also id.* 99). After giving Durango a copy of a typical treatment schedule, she told him she

---

[7] Because this analysis relies solely on the testimony of a witness — indeed, an employee — of the Government, the Court may accept the testimony as true and need not engage in an analysis of conflicts in the evidence. *See Ward I*, 197 F.3d at 1079.

thought few of those services were actually provided to patients. (*See id.* 120).[8] Foster also told Durango HP did not wait 30 days between assessments of clients, as required by Medicare. (*See id.* 121). Foster specifically told Durango HP was "recycling clients." (*Id.*). She said HP employees threatened to withhold clients' disability checks if they did not return within 30 days, which Durango testified would have been a crime. (*See id.* 122). She also told Durango HP seemed to be driven by the number of clients instead of helping patients. (*See id.*)

According to Durango, Foster stated Kallen-Zury said HP would have to close if Foster did not provide it more clients. (*See id.*). Foster told Durango she provided HP with clients' names and phone numbers in order to contact them and ask them to return, and that Kallen-Zury approved client contracts that brokered patients to Jean-Luc Veraguas ("Veraguas") and Keith Humes ("Humes"), which Durango testified would be a crime. (*See id.* 123). According to Foster, Veraguas and Humes owned recovery houses where patients were warehoused. (*See id.*). Veraguas and Humes also threatened to withhold disability checks from patients if they refused to stay, Foster recounted, and patients complained about this. (*See id.* 124–25). In fact, as Durango testified on cross-examination, Foster told him about at least seven instances of crimes being committed by or with the participation of HP. (*See id.* 125–28). Durango testified this information was not helpful to HP, and could help law enforcement stop HP's activities. (*See id.* 128–29).

The question the Court confronts is whether, given Durango's testimony, a reasonable jury could have determined Foster did *not* prove she took "affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy" and

---

[8] Durango testified it would have been a crime for HP to bill Medicare for services that were not provided. (*See* 1/28 Trial Tr. 120–21 ("Q. She gave you a copy of a typical treatment schedule, right? A. Yes. Q. And she told you that she believed few of those services were actually provided, right? A. Correct. Q. . . . [T]hat would be a crime if Medicare was being billed for services that were not being provided, right? A. Correct." (alterations added))).

9

"disclosed the scheme to law enforcement authorities." *Acuna*, 313 F. App'x at 292 (citations omitted); *see also Hyde*, 225 U.S. at 369. As explained, Foster made multiple disclosures of criminal activities at HP, including the recycling of patients, the defrauding of Medicare, and threats to withhold money from patients if they failed to return. She also named at least one individual who worked as a patient broker, and said HP employees improperly referred patients to another facility when they did not need additional treatment. And Durango testified at least seven of her disclosures to him constituted crimes, including her belief HP was fraudulently billing Medicare for services that were not provided. In sum, the disclosures Foster made to the FBI were clearly meant to disavow or defeat the purpose of the conspiracies with which she was ultimately charged more than five years later, and no reasonable jury could have found otherwise. Accordingly, Foster took both affirmative steps to disavow or defeat the conspiracies' objectives, and her disclosure of the scheme to law enforcement served to frustrate the conspiracies.

Nevertheless, the Government contends Foster "perpetuated the fraud" during the interview by lying about or concealing some of her activities — by, for instance, providing copies of "sham contracts" meant to masquerade the patient recruiting at HP. (Resp. 3 (emphasis omitted)). The Government asserts this is "an affirmative act that is committed in furtherance of a conspiracy" (*id.* 4 (footnote call number omitted)), likely in order to attempt to rebut Foster's prima facie case of withdrawal. *See United States v. Steele*, 685 F.2d 793, 804 (3d Cir. 1982) (explaining the Government "must rebut the prima facie showing either by impeaching the defendant's proof or by going forward with evidence of some conduct in furtherance of the conspiracy subsequent to the act of withdrawal" (citations omitted)).

10

CASE NO. 14-20323-CR-ALTONAGA

Yet the Government provides no persuasive authority for its contention Foster's failure to disclose her activities fully or explain the purpose of the contracts eviscerates the withdrawal she undertook. (*See* Resp. 4–5). The Government fails to adequately explain how Foster's divulging of the patient recruitment conspiracy at HP worked to perpetuate that fraud merely because she was not forthright about her activities. Given the substantive disclosures Foster made to the FBI, the Court concludes no reasonable jury could have found her interview with Durango constituted an act in furtherance of the conspiracies.[9] *Cf. United States v. Gjerde*, 110 F.3d 595, 603 (8th Cir. 1997) (holding statement was not "in furtherance of the conspiracy" for purposes of Federal Rule of Evidence 801 in part because "it was an admission about why the Fields created Minnewaska and it supports the government's case of conspiracy to defraud the United States").

Accordingly, no reasonable jury could have disagreed Foster withdrew from the charged conspiracies more than five years before she was indicted, and pursuant to 18 U.S.C. section 3282(a), Foster cannot be punished for the offenses for which she was convicted. *Cf. Smith v. United States*, 133 S. Ct. 714, 721 (2013).

---

[9] Given this conclusion, the Court does not address Foster's alternative grounds for establishing withdrawal, the earlier fax to Kallen-Zury and the conversation with Danzig. (*See generally* Mot.).

## III. CONCLUSION

Based on the foregoing analysis, and pursuant to Federal Rule of Criminal Procedure 29(c), it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 420]** is **GRANTED**. The verdict of guilt as to Tiffany Foster is **SET ASIDE**, and a judgment of acquittal will be entered separately. The U.S. Marshal is directed to release the Defendant forthwith. The Motion for New Trial **[ECF No. 421]** is **DENIED as moot**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of April, 2015.

*[signature: Cecilia M. Altonaga]*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record